UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

--------------------------------X

P. MCDOWELL,

      Plaintiff,               <u>MEMORANDUM AND ORDER</u>

  -against-                 Civil Action No.
                                CV-04-2909 (DGT)

T-MOBILE USA, INC.,

      Defendant.

--------------------------------X

Trager, J:

    Plaintiff Patrick McDowell ("McDowell" or "plaintiff")
brings this action against his former employer, T-Mobile USA,
Inc. ("T-Mobile" or "defendant").  Plaintiff alleges that
defendant discriminated against him on the basis of his race and
terminated his employment in retaliation for his complaints about
the discrimination.  Plaintiff's claims are brought pursuant to
Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.
§§ 2000e-1 <u>et</u> <u>seq</u>. ("Title VII"), the New York State Human Rights
Law, New York Executive Law, §§ 296 <u>et</u> <u>seq</u>. ("NYSHRL"), the New
York City Human Rights Law, Administrative Code of the City of
New York, §§ 8-107 <u>et</u> <u>seq</u>. ("NYCHRL") and the Civil Rights Act of
1866, 42 U.S.C. § 1981, ("Section 1981").  Defendant moves for
summary judgment pursuant to Rule 56 of the <u>Federal Rules of</u>
<u>Civil Procedure</u>.

Plaintiff's case fails for two fundamental reasons. First, plaintiff has failed to provide any evidence to suggest that other employees were treated preferentially because of racial discrimination. Although plaintiff claims that defendant failed to discipline four white employees who violated various driving rules, none of the four proposed comparators are similarly situated to plaintiff. Notably, three of the four proposed comparators did not even share the same supervisor as plaintiff. Second, Keith Zaring ("Zaring"), the critical decision-maker who recommended the revocation of plaintiff's driving privileges that led to his termination, was based in Bellevue, Washington and did not know plaintiff's race. Zaring Tr. 192:12-16. Moreover, Wayne Krum ("Krum"), the supervisor who terminated plaintiff's employment, had previously recommended plaintiff for a promotion; plaintiff, in fact, testified that Krum was "a fair supervisor" who plaintiff believed had not treated him differently because of his race. Pl. Tr. 107:18-21. In short, plaintiff has failed to provide any evidence to support his allegations of discrimination. For the reasons stated below, defendant's motion for summary judgment is granted.

## Background

### (1)

### Plaintiff's Employment At T-Mobile

On October 18, 1999, plaintiff, an African-American male, was hired as a Field Technician I by Omnipoint Communications (the predecessor in interest to T-Mobile) to work out of the Whitestone (Queens) Field Operations office.  Def.'s 56.1 Statement ¶¶ 2, 53.  As his employment duties included traveling to various cellular sites to perform maintenance, plaintiff was issued a company vehicle.  Def.'s 56.1 Statement ¶ 3. Plaintiff's initial supervisor at T-Mobile was Charles Cormier ("Cormier").  Def.'s 56.1 Statement ¶ 54.  Wayne Krum took over as plaintiff's supervisor on December 10, 2001.  Def.'s Ex. U. T-Mobile field operation supervisors were not tied to a specific work site, but oversaw individuals working out of multiple offices in the metropolitan New York area.  Krum Tr. 8:18-10:2.

In plaintiff's first annual review, which took place on May 4, 2001 and covered the previous employment year, plaintiff received low scores in several areas including performing job functions according to department procedures and maintaining a satisfactory driving record.  Def.'s Ex. BB.  Plaintiff's second review, which took place on April 25, 2002, showed that plaintiff had improved in job performance.  Def.'s Ex. FF.  At this time,

plaintiff was given a proficiency chart listing various goals, which, if met, would warrant promotion. Def.'s Ex. FF; Pl. Tr. 121:2-9, 128:3-7.

Plaintiff alleges that, at some point during his employment, he complained that he was not promoted because of his race. Pl's Tr. 131:14-22. Plaintiff, however, admits that he never "directly used the word race." Id. 131:21-22. When asked at his deposition what specifically he said in making his alleged complaint, plaintiff stated that "I might have asked [Charles Cormier], my paperwork is taking that long and the other techs didn't take that long." Id. 131:23-132:6. At his deposition, plaintiff did not recall making any other statements that he considered to be complaints about a failure to promote him because of his race. Id. 132:15-24. In opposing defendant's motion for summary judgment, McDowell filed an affidavit stating that "I complained to my supervisors about the failure to promote myself and Richard Browne in light of the promotion of the other field technicians." Pl.'s Aff ¶ 6. McDowell affirmed that he also "complained on behalf of Alan Duval." Id. ¶ 8. Richard Browne ("Browne") is African-American and Alan Duval ("Duval") is Hispanic.[1]

---

[1] Richard Browne was promoted to Field Technician II on May 1, 2002 in connection with a transfer to Florida. Pl.'s Ex. 10.;

4

Wayne Krum confirmed that plaintiff "occasionally" complained to Krum and Ian Ellis ("Ellis"), Krum's supervisor and Manager of Operations, about not being promoted. Krum Tr. 21:22-23:20; Ellis Tr. 7:24-8:23. Krum also recalled that plaintiff mentioned defendant's failure to promote Duval, but Krum did not remember plaintiff mentioning any other individuals. Id. 21:22-23:20. Although McDowell may not have complained directly to Ellis, Ellis recalled both Krum and Cormier relaying McDowell's complaints. Ellis Tr. 18:2-21; see also Krum Tr. 23:7-11 (stating that McDowell complained to Ellis).

On or about June 14, 2002, plaintiff and Krum met again to discuss plaintiff's job performance. At this time Krum believed that plaintiff had met the requisite proficiency goals and that a promotion was warranted. Pl. Tr. 122:11-123:22, 126:8-17; Def.'s Ex. HH. Krum communicated this information to Ellis, who recommended that McDowell be promoted. Ellis Tr. 17:16-19; see also Pl. Tr. 126:19-22. Plaintiff's promotion appears to have been pending when he was terminated from employment on August 13, 2002.

---

Pl.'s Aff. ¶ 4. Alan Duval was promoted sometime after August 2002. Pl.'s Br. at 17.

## The August 1, 2000 Accident

On Thursday August 1, 2002, after servicing a cellular site, McDowell returned to his parked T-Mobile vehicle and discovered its side door had been "noticeably damaged."  Pl.'s Tr. 147:2-22; Pl.'s Ex. 32.  Plaintiff maintains that he tried to report the accident to Krum that night pursuant to the terms of the VoiceStream Safety Manual ("the Manual").  However, when Krum did not answer McDowell's phone call McDowell did not leave a message.  Plaintiff believed that he could report the accident on Monday, the next day he was scheduled to work, four days after the damage had occurred.  Pl. Tr. 150:25-151:6.

It is undisputed that Krum discovered the damage to McDowell's vehicle on Monday August 5, 2002, before plaintiff reported it.[2]  When Krum confronted McDowell that day about the

---

[2]  The parties offer different accounts of how the discovery took place.  At Krum's deposition, he was asked how he learned about the accident and responded that he "saw it walking through the parking lot."  Krum Tr. 29:7-9.  In an affidavit submitted along with defendant's summary judgment motion, Krum states that Cormier, plaintiff's former supervisor, told Krum that plaintiff's vehicle was parked in a remote corner of the parking lot and that plaintiff had previously done so when his vehicle was damaged.  Krum Aff. ¶ 2.  According to Krum's affidavit, after speaking with Cormier, Krum went to plaintiff's vehicle, discovered the damage and concluded that plaintiff was attempting to conceal the damage.  Id. at ¶¶ 3-4.  These statements are absent from Krum's deposition testimony.  During Krum's testimony at plaintiff's unemployment hearing, Krum indicated that he discovered the damage while walking through the parking lot with

damage, McDowell claimed that he had not yet had the chance to report the accident.  Id. 149:6-151:18.  Krum told plaintiff that the accident should have been reported immediately and plaintiff subsequently filled out an incident report, which he gave to Krum.  Id. at 150:21-151:18.

After confronting plaintiff about the damage, Krum informed Ellis about the incident.  Ellis instructed Krum to "report it . . . in the normal procedure," which Krum interpreted as meaning that he should "fill out the company accident report and send it up to corporate."  Krum Tr. 29:23-30:23.  Krum then forwarded the accident report, which McDowell had filled out, to T-Mobile's Fleet Management Department ("Fleet Management").[3]  Id. 26:11-25. Fleet Management is responsible for managing T-Mobile's fleet of vehicles and administering its vehicle policies, including those

plaintiff.  Pl.'s Ex. 7.  However, plaintiff's own deposition testimony about the incident suggests that Krum first discovered the damage in the parking lot and then came inside to confront plaintiff about the damage.  Pl. Tr. 150:2-12.

[3]  It is not known what, if any, additional information Krum included, either orally or in writing, when he forwarded the report to Fleet Management.  The accident report lists "Krum" as reporting the accident, but does not explicitly state that McDowell failed to report the incident.  Pl.'s Ex. 33.  However, as explained infra, an August 7, 2002 email, which recommended that McDowell lose his driving privileges, includes an excerpt from T-Mobile's Vehicle Policy Manual concerning accident reporting.  The inclusion of this language implies that the sender, Keith Zaring, T-Mobile's Corporate Fleet Manager, was in some way, informed of McDowell's failure to report the accident. Def.'s Ex. KK.

found in the Manual and the Ten Point Motor Vehicle Report

Evaluation System ("10-Point System").  Zaring Tr. 9:14-20;

Zaring Aff ¶¶ 1,4.

Zaring, the Corporate Fleet Manager who was based in

Bellevue, Washington, Zaring Aff. ¶ 3, reviewed plaintiff's Motor

Vehicle Record ("MVR")[4] and accident history.  Def.'s Ex. KK.

Zaring never met McDowell and stated, at his deposition, that he

did not learn of McDowell's race until the instant lawsuit.

Zaring Tr. 192:12-16.  Before discussing Zaring's subsequent

actions, it is important to review T-Mobile's various policies

covering motor vehicle operation and McDowell's driving history.

**a.  The Manual**

The Manual provides that a driver receiving two or more

moving violations or preventable accidents within one year will

placed on probation for one year and must attend a defensive

driving course.  Pl.'s Ex. 15.  If the driver receives an

additional moving violation or is involved in a preventable

accident while on probation he will no longer be permitted to

drive for the Company and assignment of his fleet vehicle will be

---

[4]  The MVR is a report generated by third party administrators
that describes an employee's accidents and citations and any
accident prevention courses completed by the employee.  See e.g.,
Pl.'s Ex. 36 (Plaintiff's MVR that was run on May 30, 2002);
Pl.'s Exs. 13, 16, 22; see also Zaring Tr. 59:11-60:7.

revoked.  The Manual also includes an accident reporting and investigation requirement ("Reporting Requirement") under which "all accidents and injuries must be reported to the supervisor within eight working hours and the Risk Manager within 24 hours." Id.  There also appears to have been a separate "Vehicle Policy Manual" that contained similar provisions.  See Def.'s Ex. S (Aug. 7, 2002 email from Zaring to Krum excerpting portions of the Vehicle Policy Manual).  Finally, it should be noted that, although not discussed in the Manual, all field technicians were instructed to inform their supervisors of any incidents that would show up on their driving records (whether or not the incident occurred involved a company vehicle).  Pl.'s Ex. 4 (Dec. 12, 2001 email from Ellis to all field technicians).

**b.  The 10-Point System**

T-Mobile also uses a 10-Point System to "evaluate [an employee's] driving history, [] determine whether or not a driver is eligible to drive for [T-Mobile] or whether or not the driver needs some remedial attention."  Zaring Tr. 21:4-8.  Although not included in the Manual, this system was memorialized in a separate written document.  Def.'s Ex. T.  Under the 10-Point System, point values are assigned to various driving related incidents.  Driving while under the influence of alcohol or

narcotics, a hit and run violation or a speed contest/racing violation are all assigned ten points.  Reckless driving violations are assigned six points.[5]  Preventable accidents involving bodily injury are assigned four points, while preventable accidents involving property damage are assigned three points.  Any speeding violation, standard moving violation (such as careless driving, ignoring stop signs and failing to signal) or vehicle damage caused by an unidentified third party (such as if a parked vehicle were struck by an unknown person) is assigned two points.  All accidents listed on an MVR are presumed to be preventable and the driver is "responsible for proving the accident was the fault of someone else."[6]  Id.

The 10-Point System states that drivers who receive ten or more points during a three-year period will be ineligible to drive company vehicles or their personal vehicles on company

---

[5]  The 10-Point System also references "Driving while license is suspended" and "Driving without a valid license."  Although no point value is assigned to those offense, they are listed directly after the four types of violations that automatically count as ten points and before "Reckless Driving," which counts as six points.  The 10-Point System does state that the two license violations must be referred to the "Risk Management Department."

[6]  The 10-Point System specifically states that "[t]he applicant will be responsible for proving the accident was the fault of someone else."  However, Zaring testified that the 10-Point System was applied to both new applicants and current drivers.  Zaring Tr. 24:12-25:1.

business and that any exceptions must be approved by company management.  According to Zaring, in determining a driver's points, he would consider preventable accidents that appeared on the MVR, as well as any preventable accident that appear in the company's own auto accident log.  Zaring Tr. 59:11-60:9.[7]

### c.  McDowell's driving record.

Between October 17, 1999 (the day before he was hired) and August 1, 2002, plaintiff was involved in five motor vehicle accidents and received three citations for driving violations. See Def.'s Ex. W.  Below is a summary of these accidents and citations along with their corresponding point assignments under the 10-Point System.  Whether or not an accident was deemed preventable is also noted where appropriate.

On October 17, 1999, plaintiff ran a stop sign and was involved in an accident that resulted in personal injury.  This accident counted as four points and appears to have been considered preventable.  See Def.'s Ex. X (October 11, 2000 email

---

[7]  It should be noted that the point values of moving violations, as determined by state motor vehicle agencies, have little relevance to T-Mobile's 10-Point System.  Under the 10-Point System, a speeding violation counts as two points no matter how severe the infraction.  For example, the MVR of Keith Wyman, one of the comparators offered by plaintiff, shows that his four moving violations counted as sixteen state points.  However, these violations only total eight points (two point for each violation) under the 10-Point System.

from Zaring to Cormier placing McDowell on probation and apparently relying on October 17, 1999 accident); Pl.'s Ex. 36; Zaring Tr. 51:3-18. On May 2, 2000, plaintiff was involved in an accident with his T-Mobile vehicle, involving property damage. Def.'s Exs. T, W; Pl. Ex. 6. On September 21, 2000, plaintiff was again involved in an accident with his T-Mobile vehicle. Both of those accidents counted as three points under the 10-Point System and both appear to have been considered preventable. See Pl. Tr. 91:25-92:34; 93:17-19; Def.'s Exs. W, Z. On October 1, 2000, plaintiff received a speeding ticket and was convicted of this violation on October 24, 2000. On October 2, 2000, plaintiff received another speeding ticket; he was convicted of this violation on October 11, 2000. These citations each counted as two points under the System. Def.'s Exs. T, W.

In early October 2000, Zaring was notified of plaintiff's accidents and reviewed his MVR. On October 11, 2000, Zaring emailed Cormier, plaintiff's then-supervisor, informing him that plaintiff had "10 points against him."[8] Pl.'s Ex. Z. Zaring also explained that "at least two of these accidents happened within a one-year period," implicitly referring to the Manual's

_____

[8] This total does not appear to include the two October 2000 speeding violations, which were unlikely to have been on the MVR Zaring reviewed at the time, given that plaintiff was not convicted of these violations until October 11, 2000 and October 24, 2000.

12

probation policy.  Pl.'s Ex. 6.  Zaring recommended that
plaintiff be placed on probation for one year and take a
defensive driving course.  <u>Id.</u>  In placing McDowell on probation,
Zaring noted that although he believed the 10-Point System was
discretionary, he wanted to be sure that "any action [taken with
regard to McDowell] be consistent with past and future actions in
similar circumstances."[9]  <u>Id.</u>


**(3)**

**Revocation Of McDowell's Driving Privileges And Termination**

Returning to August 2002, after being informed of McDowell's
accident, Zaring reviewed plaintiff's MVR, which had been run on
May 30, 2002.[10]  The MVR listed the following five accidents and
citations: the October 17, 1999 accident, the September 21, 2000

---

[9]  On February 27, 2001, plaintiff received a citation for
obstructing an intersection.  This citation counted as two points
under the 10-Point System.  Def.'s Exs. T, W.  On May 25, 2001,
plaintiff's vehicle, which was left unoccupied in the T-Mobile
parking lot, was dented.  This accident could have counted as two
points under the 10-Point System.  Def.'s Ex. T; Pl. Tr. 88:9-
89:16.  This accident, however, may have been considered non-
preventable.  Transcript of L'Etta Gulbin 104:8-13.

[10]  Zaring could not recall why McDowell's MVR was run at this
time.  Zaring Tr. 52:6-11.  McDowell was not on probation at the
time; nor had he recently been involved in an accident.  <u>See</u>
Zaring Tr. 45:11-17 (stating that Wilmouth would request MVRs
"when a driver was involved in a preventable accident . . . or if
the driver was on probation, she would request periodic MVRs
during the driver's probation period.")

13

accident, the two October 2000 citations and the February 27, 2001 citation. Zaring Tr. 43:5-6; Pl.'s Ex. 36; Def.'s Ex. W. Karen Wilmouth, Zaring's fleet administrator, calculated the point values for each accident and citation and wrote them on the MVR. Zaring Tr. 51:7-14. Zaring then noted that the points totaled thirteen and added an exclamation point to emphasize that this was "important" and "need[ed to be brought] to somebody's attention."[11]

After reviewing plaintiff's driving record, Zaring emailed Krum on August 7, 2002. Def.'s Ex. KK. In the email, Zaring noted that plaintiff had been placed on driving probation "beginning on 10/11/01" [sic] and violated the terms of his probation by receiving a moving violation in February 2001.[12]

---

[11] Defendant asserts that McDowell actually had nineteen points at the time because this MVR did not reference plaintiff's May 2, 2000 and August 1, 2002 accidents, which defendant asserts would count as three points each. There is no evidence suggesting that Zaring considered either of these accidents in determining plaintiff's point total in August 2002. Moreover, in asserting that McDowell had nineteen points, defendant appears to have counted the August 1, 2002 accident as three points. Although this accident could have counted as two points, see Pl.'s Ex. 14 (designating "[v]ehicle damage caused by unidentified third party (parked vehicle struck by unknown person)" as a two point violation), it appears to have been non-preventable. Interestingly, in a letter to the EEOC, which is discussed infra, defendant implied that plaintiff actually had twenty-three points under the 10-Point System. Pl.'s Ex. 33. It is unclear how this total was calculated.

[12] Zaring's August 7, 2002 email stated, incorrectly, that plaintiff's probation began on October 11, 2001. However, as

14

Id. Apparently, McDowell had never informed T-Mobile of this moving violation. The email also included excerpts of several portions of T-Mobile manuals, including: (1) sections on Driving Violations; (2) sections on Accident Reporting; and (3) a section describing the conditions under which a vehicle assigned to an employee may be withdrawn. Zaring concluded the email, stating that "Patrick violated the terms of his probation and should, in my opinion, be removed from driving privileges. If Charlie [Cormier, McDowell's former supervisor,] can not [sic] provide evidence that Patrick had been notified of his probationary status, we won't be able to use this evidence."[13] Id. At his deposition, Zaring stated that although he was "not sure why" he was focused on the probation issue at that time, he was "looking at [the probation issue] and not specifically at the ten-point policy." Zaring Tr. 69:5-19. Although it is unclear who ultimately made the determination to revoke McDowell's driving privileges, Zaring's recommendation in the email appears to be the final decision on this issue. See Krum Tr. 25:21-26:9 (Krum

_____

discussed infra, that appears to have been a typo as the remainder of the email illustrates that Zaring considered plaintiff to have been on probation from October 2000 until October 2001. See also Pl.'s Ex. 6 (October 11, 2000 email from Zaring to Cormier discussing McDowell being placed on probation).

[13] Plaintiff admits that he was aware that he was placed on probation after he had an accident in September 2000. Pl. Tr. 139:17-141:6.

stated that "T-Mobile" revoked McDowell's driving privileges, but was unable to identify the particular individual who made that decision).[14]

At some point, most likely after receiving this email, Krum spoke with both Zaring and Ellis about what should be done with McDowell now that his driving privileges had been revoked. Id. 27:1-17. The decision was eventually made that McDowell had to be terminated because there no other positions available for an individual without driving privileges. On August 12, 2002, Krum informed McDowell that he was being terminated and presented him with a dismissal form, which stated:

> Patrick, On 8/5 admitted to me you were involved in an accident. You made no attempt to report this incident until you were questioned by myself on 8/5. This is in direct violation of Voicestream policy. Following this incident, your MVR was reviewed and a directive was issued by corporate fleet management to cease your company driving privileges. At the current time Voice Stream has no positions open for technicians without Voicestream driving privileges.

---

[14] It should be noted that although Zaring may have been responsible for discipline involving violations of probation and violations of the 10-Point System, it appears that a driver's supervisor was responsible for discipline involving violations of the Reporting Requirement. See Zaring 176:21-177:14 (explaining that although he may have alerted supervisors that late reporting of accidents was in violation of company policy, he could not recall "ever [making] a specific recommendation about disciplinary action" for late accident reporting).

Def.'s Ex. G.  Although the dismissal form appears to have been drafted by Krum and L'Etta Gulbin ("Gulbin"), Regional Employee Relations Manager, Krum Tr. 41:24-42:8, it is unclear who made the ultimate decision to terminate plaintiff.

## (4)

### T-Mobile's Correspondence With The EEOC

At some point prior to his filing of the instant suit, plaintiff filed a charge with the Equal Employment Opportunity Commission ("EEOC").  See Def.'s Ex. A (July 12, 2004 Complaint). In response to this charge, T-Mobile forwarded, on March 20, 2003, a statement of position ("statement of position") to the EEOC denying that McDowell was discriminated against.[15]  Pl.'s Ex. 4.  The statement of position (and two subsequent addenda) were prepared by Gulbin and reviewed by defendant's legal department.  Gulbin Tr. 55:14-56:3.  The statement of position detailed the events leading up to McDowell's termination, including the four accidents that McDowell was involved in on May 2, 2000, September 21, 2000, May 25, 2001 and August 1, 2002 and McDowell's failure to report the final accident.  Id.  The statement of position also asserted, incorrectly, that McDowell had been put on probation starting October 10, 2001 (actually

---

[15]  This letter is incorrectly dated March 20, 2002.

October 2000).  In explaining applicable company policies, the
statement of position cited to the 10-Point System and the
Reporting Requirement and also paraphrased the Manual's rule that
driving privileges will be revoked if a driver is involved in a
preventable accident while on probation.  The statement of
position went on to state that

> [McDowell's] MVR . . . revealed that due to the
> number of accidents reported on his driving record
> he had accumulated thirteen points on his driver's
> license.  This exceeds the maximum number of points
> allowed for any employee required to drive for the
> Company.  The Company limit is ten.
>
> Because [McDowell] could no longer drive a Company
> vehicle the Company attempted to find him a
> position that did not require him to drive.

Pl.'s Ex. 4.  The statement of position also analyzed McDowell's
failure to promote claim.  <u>Id.</u>

On November 14, 2004, T-Mobile submitted an addendum ("first
addendum") to its original statement of position, explaining some
of its employment policies.  Pl.'s Ex. 33.  The first addendum
stressed that "the Company retains the right to handle any
situation in its sole discretion and in any manner it chooses,
including, but not limited to, revoking Company driving
privileges and/or imposing discipline up to and including
termination."  <u>Id.</u>  The first addendum maintained that McDowell
was placed on probation in October 2001 and added that "even if

[McDowell] had been placed on probation in October 2000 opposed to October 2001, the date of probation is not relevant, [McDowell] has acknowledged to the Commission that the Company in fact placed him on driving probation during his employment due to his driving record." <u>Id.</u>  In addressing three white employees, Keith Wyman ("Wyman"), Bernard Gautier ("Gautier") and Skender Metjahic ("Metjahic"), who had their licenses suspended, T-Mobile stated that none of these employees violated the 10-Point System and that T-Mobile was unaware of their license suspensions because it had no reason, prior to requests by the EEOC, to run the MVRs of these drivers.  Finally, in discussing McDowell's driving record, the first addendum stated that McDowell had thirteen points on his license and, under T-Mobile's internal driving policy, he had an "<u>additional 10-points</u> on his internal driving record." <u>Id.</u> (emphasis in original).

On April 7, 2004, T-Mobile submitted a second addendum ("second addendum").  Pl.'s Ex. 29.  The EEOC had inquired about the current employment status of Wyman, Gautier and Metjahic and had asked what, if any, actions had been taken against these individuals.  The second addendum responded that although

> these employees did not report [their license
> suspensions] to their supervisors at the time of
> the incident . . . . the Company utilized is [sic]
> sole discretion in exercising leniency towards
> these employees in the same manner that such

19

> leniency was extended to [McDowell] after he
> engaged in multiple accidents in a Company vehicle
> and his employment was still intact during that
> time.

Id. The second addendum does not identify which individuals made this decision or at what level this decision was made. The second addendum did note that "none of [the three white employees] are continuing to drive with a suspended license." Id.

## Discussion

### (1)

### Title VII

Title VII makes it unlawful for employers to intentionally discriminate against employees with respect to conditions of employment because of an employee's "race, color, religion, sex or national origin." See 42 U.S.C. § 2000e-2(a). Title VII also protects employees from being retaliated against for opposing any practice made unlawful by Title VII or participating in a Title VII proceeding or investigation. See 42 U.S.C. §2000e-3(a).

As plaintiff has not presented direct evidence of discrimination, the burden-shifting framework set forth in

<u>McDonnell Douglas Corp. v. Green</u> applies.  411 U.S. 792 (1973);

<u>Cruz v. Coach Stores, Inc.</u>, 202 F.3d 560, 565 (2d Cir. 2000).[16]

At the first step of the <u>McDonnell Douglas</u> framework, the

employee raises a presumption of discrimination if he or she

establishes a prima facie case of discrimination or retaliation.

<u>Texas Dep't of Community Affairs v. Burdine</u>, 450 U.S. 248, 254

(1981).  The burden then shifts to the defendant to produce a

"legitimate nondiscriminatory reason" for its rejection or

dismissal of the plaintiff.  <u>McDonnell Douglas</u>, 411 U.S. at 802.

If the defendant produces such a reason, the burden shifts back

to the plaintiff to prove by a preponderance of the evidence that

the defendant's reasons are a pretext for discrimination.

<u>Burdine</u>, 450 U.S. at 253; <u>see</u> <u>also</u> <u>St. Mary's Honor Ctr. v.</u>

<u>Hicks</u>, 509 U.S. 502, 517 (1993) (holding that the plaintiff must

show that the defendant's proffered reasons are false and that

---

[16] Plaintiff's claims brought under NYSHRL and NYCHRL are subject
to the same analysis as claims brought under Title VII. <u>See</u> <u>Mack</u>
<u>v. Otis Elevator Co.</u>, 326 F.3d 116, 122 n.2 (2nd Cir. 2003);
<u>Cruz</u>, 202 F.3d at 565 n. 1 (2d Cir. 2000).  Section 1981
employment discrimination claims are analyzed under the same
burden-shifting framework as Title VII. <u>Wong v. Kings County</u>
<u>Dist. Attorney's Office</u>, No. 02-cv-3740, WL 692165, at *3
(E.D.N.Y. Mar. 31, 2004).  However, Section 1981 requires proof
of intentional discrimination, a higher standard than that of
Title VII cases.  <u>Patterson v. County of Oneida</u>, 375 F.3d 206,
225 (2d Cir. 2004).  Therefore if summary judgment is granted for
the Title VII claims, defendant will be entitled to summary
judgment for the Section 1981 and state law claims as well.
<u>Patterson</u>, 375 F.3d at 226.

the defendant's actual motivation was discriminatory).  Although
a burden-shifting framework is used, "the ultimate burden of
persuading the trier of fact that the defendant intentionally
discriminated against the plaintiff remains at all times with the
plaintiff."  Burdine, 450 U.S. at 253.


### (2)

### Failure to Promote

To establish a prima facie case for failure to promote,
plaintiff must show that (1) he is a member of a protected class;
(2) he applied and was qualified for a position to which
defendant was seeking applicants; (3) he was rejected for the
position; and (4) the position "remained open and the employer
continued to seek applicants."  Cruz, 202 F.3d at 565 (quoting
Brown v. Coach Stores, Inc., 163 F.3d 706, 709 (2d Cir. 1998)
(citations omitted)).

It is undisputed that plaintiff satisfies the first two
elements of his prima facie case.  However, plaintiff is unable
to establish that he was, in fact, rejected for the position.
Prior to his termination, both Krum and Ellis recommended
plaintiff for a promotion, which was apparently pending at the
time of plaintiff's termination.  Plaintiff fails to explain how
he was rejected for the sought-after position, given that

recommendation.

Even if plaintiff could establish a prima facie case, defendant, in offering McDowell's May 4, 2001 performance review, has presented a legitimate non-discriminatory reason why McDowell had not been recommended for promotion earlier. Def.'s Ex. BB. Plaintiff is unable to show that this reason was pretextual. First, plaintiff's attempt to distinguish the promotion of Richard Browne, another black field technician, solely because Browne's promotion occurred in connection to a transfer to Florida, is unpersuasive. Second, plaintiff has offered no evidence, other than his own affidavit, to support his allegation that "[d]uring the court of my employment, I learned that the white field technicians had all been promoted." Pl.'s Aff. ¶ 5. In fact, although no breakdown of the promotions in McDowell's specific work location has been provided, only seven out of the forty-two white Level 1 Field Technicians working in the New York metro area were promoted during plaintiff's tenure at T-Mobile. Pl.'s Ex. 10. Notably, neither Kenneth Dransfield ("Dransfield") or Metjahic, both of whom plaintiff proposes as comparators in making his claim of unlawful discharge, were promoted from their positions as Level I Field Technicians during this time. Id. Third, even if plaintiff's assertion about promotions were accurate, he has presented no evidence that any of the promoted

23

field technicians received negative performance reviews
comparable to plaintiff's May 4, 2001 review.

**(3)**

**Unlawful Discharge**

**a.  Prima Facie Case**

To establish a prima facie case of unlawful discharge
plaintiff must show (1) membership in a protected class; (2)
qualification for the position; (3) an adverse employment action;
and (4) circumstances giving rise to an inference of
discrimination based on plaintiff's membership in a protected
class.  <u>McDonnell Douglas</u>, 411 U.S. at 802.  At this stage the
plaintiff's burden is minimal.  <u>Zimmermann v. Assocs. First
Capital Corp.</u>, 251 F.3d 376, 381 (2d Cir. 2001).  It is
undisputed that plaintiff meets the first and third elements.

Plaintiff also meets the second element of the prima facie
case.  Plaintiff only needs to show basic eligibility for the
position from which he was terminated in order to establish that
he was qualified.  <u>Slattery v. Swiss Reinsurance Am. Corp.</u>, 248
F.3d 87, 91-92 (2d Cir. 2001).  Where termination is at issue and
the employer has already hired the employee, the inference of
minimal qualification is not difficult to draw.  <u>Id.</u> at 92
(quoting <u>Gregory v. Daly</u>, 243 F.3d 687, 695-96 (2d Cir. 2001)).

Defendant argues that plaintiff cannot meet the qualification prong because plaintiff violated various internal policies and, as such, was not performing to T-Mobile's "satisfaction." Def.'s Brief at 9. Defendant is essentially attempting to use the reasons for McDowell's termination to show that he was not qualified for the position. However, committing misconduct that results in termination is different from not being qualified for a position. See Slattery, 248 F.3d at 92 (concluding defendant's "dissatisfaction with [plaintiff's] work performance," which defendant also offered as its legitimate reason for discharge, did not show that plaintiff was not qualified for "a job whose duties he had been performing for seven years"). Here, McDowell was meeting the proficiency goals set for him by his supervisors and had a promotion pending at the time he was terminated. As such, it is difficult to see how plaintiff was not qualified for his position.

The Second Circuit has "characterized the evidence necessary to satisfy [the fourth prong of the prima facie case] as 'minimal' and 'de minimis.'" Zimmermann, 251 F.3d at 381 Plaintiff points to discrepancies in defendant's statements to the EEOC and defendant's conflicting statements about its policy for running MVRs. Plaintiff also maintains that similarly situated white employees were treated more favorably. It will be

assumed that this evidence is sufficient, at this stage, to raise an inference of discrimination.  Each of these points will be addressed in-depth under the pretext analysis.

The burden now falls on defendant to offer legitimate, nondiscriminatory reasons for its employment actions.

## b.  Defendant's legitimate nondiscriminatory reasons

Defendant proffers three reasons for its actions.  First, plaintiff failed to timely report his motor vehicle accident as required by T-Mobile's policy.  Second, plaintiff violated the terms of his probation by receiving a citation for a moving violation.  Third, plaintiff violated the 10-Point System by having an excess of ten points on his driving record.  Because defendant has offered nondiscriminatory reasons for its action, plaintiff now bears the burden of persuasion to show that defendant's proffered reasons were a pretext for unlawful discrimination.

Before addressing pretext, it must be stressed that there appears to have been two separate components to McDowell's termination: (1) the decision to revoke his driving privileges; and (2) the decision to terminate his employment because no non-driving positions were available.  Although the former led directly to the latter, plaintiff focuses on the former decision

and offers no evidence to suggest that the latter decision was
discriminatory.


**c. Pretext**

To survive summary judgment, plaintiff must now "prove by a
preponderance of the evidence that the legitimate reasons offered
by the defendant were not its true reasons, but were a pretext
for discrimination." <u>Reeves v. Sanderson Plumbing Products,
Inc.</u>, 530 U.S. 133, 143 (2000). Plaintiff "may attempt to
establish that he was the victim of intentional discrimination
'by showing that the employer's proffered explanation is unworthy
of credence.'" <u>Id.</u> (quoting <u>Burdine</u>, 450 U.S. at 256 (1981)).
There are three potential bases for undermining the reasons set
out by defendant: (1) plaintiff's proffer of potentially
similarly situated white employees whom plaintiff claims were not
disciplined for violating T-Mobile rules; (2) discrepancies in
defendant's statements to the EEOC; and (3) conflicting
explanations of defendant's policy for running MVRs.

**i. Similarly situated white employees**

Plaintiff argues that defendant failed to discipline four
white employees, Wyman, Dransfield, Gautier and Metjahic, who
also violated various driving rules. A plaintiff can establish
disparate treatment by showing that similarly situated employees

outside of the plaintiff's protected group were treated more favorably. <u>Graham v. Long Island R.R.</u>, 230 F.3d 34, 39-41 (2d Cir. 2000). However, the comparators must be "similarly situated in all material respects." <u>Id.</u> At 40. There is no specific set of criteria used to determine whether employees' conduct is comparable and the "all material respects" standard does not require that the conduct be identical. <u>Id.</u> Rather, the determination of whether two employees are similarly situated in all material respects is based on "(1) whether the plaintiff and [his comparators] were subject to the same workplace standards and (2) whether the conduct for which the employer imposed discipline was of comparable seriousness." <u>Id.</u> (citing <u>Norville v. Staten Island Hosp.</u>, 196 F.3d 89, 96 (2d Cir. 1999)).

Plaintiff and the comparators were subject to the same workplace rules, namely, T-Mobile's various motor vehicle policies. However, there is no evidence that Dransfield, Gautier or Metjahic had the same supervisor as plaintiff. Krum Tr. 8:7-17 (listing Krum's subordinates), 20:25-21:1 (stating that he had never heard the name "Gautier"). "In the Second Circuit, whether or not co-employees report to the same supervisor is an important factor in determining whether two employees are subject to the same workplace standards for purposes of finding them similarly situated." <u>Conway v. Microsoft Corp.</u>, 414 F. Supp. 2d 450, 465

(S.D.N.Y. 2006) (collecting cases); see also Downes v. Potter,
No. 04-cv-3876, 2006 WL 2092479, at *11 n. 4 (E.D.N.Y. July 26,
2006) (citing Conway and stating that "although the existence of
different supervisors is not necessarily dispositive under the
Second Circuit case law in determining whether two employees are
similarly situated, it is obviously an important factor.").
Although Dransfield, Gautier and Metjahic may have also been
under the broader supervision of Ian Ellis, Ellis Tr. 8:3-6
("Part of my duties would encompass managing the field operation
crew."); Pl.'s Ex. 4 (December 14, 2001 email from Ellis to all
field technicians, which was sent to 40 employees including
McDowell, Dransfield, Gautier and Wyman), and Zaring, that is
insufficient to make them similarly situated to plaintiff.
Critically, Zaring, who appears to have been the decision-maker
regarding driving privilege revocations, was not, as explained
infra, even aware of plaintiff's race.  As such, any failure to
discipline Dransfield, Gautier or Metjahic for misconduct cannot
give rise to an inference of discrimination.

    Even putting aside the supervisor issue, none of these three
comparators could be considered similarly situated to plaintiff.
There is some evidence that Dransfield may have reported an
accident late.  Zaring Tr. 175:1-176:4; Pl's Ex. 5.  However,
plaintiff has offered no evidence that Dransfield was not

disciplined for this infraction.  <u>See</u> Pl's Ex. 29 (explaining
that the other three comparators were not disciplined for having
suspended licences, but not discussing Dransfield in any manner).
Because plaintiff bears the burden of proof, this absence of any
proof showing that Dransfield was treated more favorably is fatal
to plaintiff's claim.  Moreover, it should be stressed that, on
its face, McDowell's failure to report an accident would appear
to be a more serious offense than merely reporting an accident
late.

Plaintiff also maintains that Dransfield had over ten points
under the 10-Point System.  However, Dransfield would only have
accumulated over ten points if his March 8, 2002 conviction for
unsafe operation of a motor vehicle is counted as six points.
Pl.'s Ex. 13.  The 10-Point System does not specify how many
points this violation counts for.  Although "reckless driving"
counts as six points, a "standard moving violation," which
includes convictions for "careless driving," counts as only two
points.  Pl.'s Ex. 14.  Plaintiff, who bears the burden of proof,
fails to present any evidence showing why the March 8, 2002
conviction should be treated as "reckless driving," as opposed to
a "standard moving violation."  As such, plaintiff cannot show
that Dransfield accumulated ten points under the 10-Point System.
Finally, there is evidence that Dransfield received a citation

while he was on probation.  Pl.'s Ex. 11-13, 21.  Plaintiff,
however, has neither raised this issue nor provided any evidence
that Dransfield was not disciplined for this infraction.

Plaintiff is also unable to look to either Gautier or
Metjahic to raise an inference of discrimination.  First,
plaintiff claims that Gautier did not report a March 26, 2002
accident until July 10, 2002.  Plaintiff's claim is based
primarily on the conclusions he draws from an email
correspondence between Gautier and Diana Rodriguez of Corporate
Claims that took place between July 1, 2002 and July 10, 2002.[17]
In the first email, Rodriguez attached a "Flash Incidence Report"
to be filled out by Gautier and forwarded to ARI.  Gautier
returned the form and Rodriguez then asked Gautier to state the
date of his incident.  Gautier responded that the accident took
place on March 26th and apologized for not reporting the claim
sooner because "[he] had a claim in for the rear cause [sic]
someone rear ended [him] on April 2."  Pl.'s Ex. 24.  Plaintiff's
claim is also based on a document that appears to be the print-
out of an online summary detailing the March 26, 2002 accident.
Pl.'s Ex. 23.  The accident details are classified under several

_____

[17]  Rodriguez was not deposed in connection with this case and the
parties have not clarified her connection to T-Mobile.  The only
mention of Rodriguez is in the email cited by plaintiff.  In this
email, Rodriquez' title is identified as "Rodriquez, Diana (Corp
Claims)."

headings including "Accident Date Time", "Rpt Date Time", "How Reported" and "Reported By."  The document does not include any headings detailing when an employee reported the accident to his or her supervisor.

Analysis of plaintiff's claim against Gautier is difficult, as there is no testimony explaining exactly what the various fields on the online accident summary refer to.  However, careful scrutiny of the accident summary and the email correspondence indicated that Gautier did not violate the Reporting Requirement. Rather, the documents appear to show that Gautier was late in filing what appears to be an accident claim form.  The close temporal proximity between the email correspondence and the dates listed on the online summary lead to this conclusion.

The email correspondence between Rodriguez and Gautier concluded on July 10, 2002.  Pl.'s Ex. 24.  July 11, 2002 is listed under the "Rpt. Date Time" heading on the online summary. The only reasonable inference to be drawn here is that the information disclosed to Rodriguez became part of an official report on July 11, 2002, over two months after the March 26, 2002 accident.  However, the Reporting Requirement does not require an employee to report an accident to Corporate Claims within a specified time period.  As plaintiff has not provided any evidence indicating when Gautier reported the March 26, 2002

accident to his supervisor, there is no evidence that Gautier

violated the Reporting Requirement.[18]

In addition to plaintiff's allegation that Gautier reported

an accident late, plaintiff also points out that both Gautier and

Metjahic had their licenses were suspended.  Although neither

Gautier nor Metjahic were disciplined for these suspensions, as

discussed _infra_ n. 24**,** these incidents do not give rise to an

inference of discrimination.

Unlike the other proposed comparators, who did not share the

same supervisor as plaintiff, Wyman was supervised by Krum from

the end of 2001 until sometime in 2004.  Therefore, Wyman could

potentially be similarly situated to plaintiff.  However, as

explained below, there is ultimately no basis for finding that

Wyman is similarly situated to plaintiff.

On October 25, 2001, Wyman's license was suspended.  Pl.'s

Ex. 16.  Wyman's MVR does not indicate the length of Wyman's

suspension.  There is evidence that Wyman's supervisor may have

been aware of this violation when it occurred.  At his

deposition, Krum stated that Wyman's previous manager had told

him that Wyman's license had been suspended.  Krum, who became

---

[18]  The Manual also requires that accidents be reported to "Risk
Management" within twenty-four hours.  Nothing in the record
explains the role of Risk Management or which employees worked
there.

Wyman's supervisor at the end of 2001, was informed of this fact
sometime between October 25, 2001 and the end of 2001. Krum Tr.
57:14-20. Krum did not believe that Wyman was ever placed on
probation for this violation, Krum Tr. 57:8-58:8l; the second
addendum also states that no action was taken against Wyman.

The 10-Point System does not assign a point value to license
suspensions. As noted earlier, the 10-Point System does,
however, list "Driving with a Suspended License" directly after
the four types of violations that automatically count as ten
points and before "Reckless Driving," which counts as six points.
The 10-Point System also states that violations for driving with
a suspended license must be referred to the "Risk Management
Department." Additionally, the Manual states that "[i]f the
employee's license is suspended at any time, they will not be
permitted to drive for the company for any purpose." Pl.'s Ex.
15. The fact, unexplored by plaintiff, that license suspensions
are to be referred to Risk Management may distinguish such
violations from plaintiff's misconduct. However, although the
two types of conduct are clearly not the same, a question of fact
exists as to whether they are "comparable" offenses.

Even if Wyman's suspension is comparable to plaintiff's
misconduct, plaintiff runs into the problem that Krum was not
Wyman's supervisor when this incident occurred. Moreover, given

34

the cursory questioning concerning this incident at Krum's deposition, plaintiff is unable to show that Krum had a duty to report this incident when Wyman was being overseen by a different supervisor at the time.[19]  Even assuming that a jury could infer

---

[19]  Below is the complete deposition testimony concerning this incident.

> Q: So is today the first time you're hearing that somebody is saying [Wyman's] license was suspended?
>
> A: I had overheard it in the office, but that was – it was previous to when I had worked with him.
>
> Q: And you worked with him starting in 2001, end of 2001?
>
> A: Yes.
>
> Q: So you had heard before you started working with him, you had heard that his license had been suspended?
>
> A: Yes.
>
> Q: Where did you hear that from?
>
> A: It was from his previous manager.
>
> Q: That was all.
>
> A: While he was underneath, while he was your subordinate, was he ever put on probation?
>
> A: Not that – not when he worked for me, no.
>
> Q: At any other time that you're aware of?
>
> A: No, I'm not aware.

Krum Tr. 57: 8–58:5.

from Krum's scant deposition testimony on this incident that Krum did nothing when he heard about Wyman's suspension, absent such a duty, it is difficult to see how any such inaction by Krum is probative of discriminatory intent.

In addition to relying on Wyman's suspended license, plaintiff also argues that Wyman exceeded ten points under the 10-Point System and that Wyman should have been placed on probation for receiving, on two separate occasions, two citations within a twelve month period.

On April 6, 2000, August 8, 2001 and September 5, 2001 Wyman was convicted for speeding. On April 17, 2000, Wyman was convicted for disobeying a traffic device. Pl.'s Ex. 16. Each citation counts as two points under the 10-Point System, for a total of eight points. Pl.'s Ex. 14. On November 1, 2001, Wyman was involved in an accident in which his car sustained damage. Pl.'s Ex. 17. Neither of the two documents in the record related to this accident indicate whether it was classified as preventable or non-preventable. However, the Motor Vehicle Incident Report for this accident provides the following description: "I was driving north on whitestone bridge about 35 mph with about 15-20 feet [between] us when the cars in front of me locked there [sic] brakes[,] I locked mine but hit the van in front of me." <u>Id.</u> Defendant argues that because there was no

formal designation of this accident as preventable, it cannot be
counted against Wyman.  However, a jury could reasonably infer
from the description of this accident, which appears to have
involved Wyman rear-ending another car, that it was preventable.
Defendant offered no evidence to the contrary from either Wyman
or any of his supervisors, and absent such evidence, the 10-Point
System presumes accidents to be preventable.[20]  As such, a
question of fact exists concerning whether Wyman's November 1,
2001 accident was preventable.  If this accident was preventable,
Wyman would have had eleven points as of November 1, 2001.[21]

Although Wyman was never disciplined for accumulating more
than ten points, this decision cannot give rise to an inference

---

[20]  It should be noted that Karen Wilmouth, Zaring's fleet
administrator, concluded that plaintiff's October 17, 1999
accident was preventable, even though that accident was never
formally classified in a T-Mobile document as preventable.
Because that accident occurred prior to plaintiff's employment
with defendant, no incident report listing the accident's
classification would have been generated internally.

[21]  During a discovery dispute, defendant raised the argument
that under the 10-Point System's three-year sunset rule, two of
Wyman's moving violations (from April 6, 2000 and April 17, 2000)
would no longer be counted because they occurred over three years
prior to Wyman's MVR being run in November 2003.  Defendant's
attempt to apply the sunset rule in this manner is somewhat
disingenuous and appears to contradict the purpose behind the
sunset rule.  If Wyman did in fact have eleven points as of
November 1, 2001, it seems strange that those points would be
wiped off his record simply because defendant did not become
aware of these points until two years later.

of discrimination.  Prior to the EEOC requesting the MVRs of the comparators in 2003, MVRs had not been run (or at least had not been recently run) on any of the individuals proposed as comparators.  As such, defendant was not aware of Wyman's moving violations at the time they occurred.[22]  Once defendant received Wyman's MVR in 2003, it became aware of the incidents referenced therein; the second addendum indicates that defendant elected not to discipline Wyman for these incidents.  However, plaintiff has failed to offer any evidence identifying who at T-Mobile was responsible for the decision not to discipline Wyman.  Without this critical information, it cannot be said that the decision not to discipline Wyman for violating the 10-Point System is probative of discriminatory intent.[23]  Similarly, this rationale is equally applicable to defendant's decisions, made after receiving Wyman's MVR in 2003, not to discipline Wyman for his license suspension and not to place Wyman on probation based on

---

[22]  As explained _infra_, the parties dispute the content and application of T-Mobile's policy for running MVRs.  Even if, as McDowell argues, he was unfairly targeted when his MVR was run, without explanation, in May 2002, Zaring's lack of knowledge concerning plaintiff's race eliminates the possibility that this action was motivated by plaintiff's race.

[23]  By contrast, if plaintiff had presented evidence that Krum, Ellis and Zaring (assuming that he had become aware of McDowell's race by then) had been involved in this decision, an inference of discrimination could have potentially arisen from this decision.

his moving violations in 2000 and 2001.[24]

Finally, plaintiff also maintains that Wyman is similarly situated because he failed to timely report an accident. According to plaintiff, Wyman did not report his March 3, 2003 accident until March 10, 2003. Krum was Wyman's supervisor at this time of this accident. In support of this claim, plaintiff relies on an electronic document detailing Wyman's March 3, 2003 accident. Pl.'s Ex. 31. The document lists the "Accident Date Time" as March 3, 2003 and the "Rpt Date Time" as March 10, 2003. Although plaintiff's counsel asked Zaring questions about a number of different types of documents related to accidents, no questions were asked about the specific type of document listing Wyman's March 3, 2003 accident.[25] There is no testimony as to what that document represents or what the various fields on the document refer to. As such, there is no evidence from which a jury could infer that Wyman reported this accident to Krum seven

---

[24] For the same reason, defendant's decision not to discipline Gautier and Metjahic upon discovering in 2003 that their licenses had been suspended (on September 15, 2000 and October 30, 2002, respectively) is not probative of any discriminatory intent.

[25] Zaring was asked about the following documents, "PM 720", "PM 730", "Z-22", "Z-23." Zaring Tr. 172:14-175:15. "Z-22," submitted as Pl.'s Ex. 5, is a three page spreadsheet listing "Accident Date[s]" and "Reported Date[s]"; Wyman is not listed among the drivers on this document. None of the other three documents referenced at Zaring's deposition are part of the record.

days after it occurred. Although the "Rpt Date Time" could refer to when the accident was reported to fleet management, corporate claims or defendant's third-party administrator, there is no reason to believe that this field refers to when an accident is reported to a driver's supervisor. Moreover, as noted earlier, late reporting of accidents would appear to be a less serious violation than a complete failure to report an accident.

### ii. Defendant's statements to the EEOC and conflicting statements regarding defendant's policy for running MVRs

Plaintiff points to a number of inconsistencies between defendant's communications to the EEOC and the evidence in the record, as well as defendants' conflicting explanations of its MVR policy.

First, the statement of position and the two subsequent addenda incorrectly identified McDowell as being on probation starting in October 2001. The statement of position went on to explain that "[u]nder the terms of probation the Complainant was required to participate in and complete a defensive driving course, and be accident free for the duration of his probationary period, twelve months," implying that plaintiff's August 1, 2002 accident constituted a violation of his probation. Pl.'s Ex. 4. Defendant concedes that plaintiff's probation began in October 2000 and ended in October 2001. This error may have been a

result of Gulbin relying on Zaring's August 7, 2002 email, which stated that "[d]uring the one-year probation beginning on 10/11/01, Patrick received a moving violation thus violating the parameters of probation." Gulbin Tr. 54:19-55:2 (stating that Gulbin received information about McDowell's probation from the fleet manager); Def.'s Ex. KK. That appears to have been a typographical error by Zaring, as Zaring determined that McDowell's February 27, 2001 moving violation violated his probation. That violation would only have been within a year of the start of McDowell's probation if his probation began in October 2000. However, despite this information being available on McDowell's MVR, which was attached to the statement of position, T-Mobile insisted, in three separate filings with the EEOC that McDowell's probation started in October 2001. It must also be noted that in discussing McDowell's probation, the first addendum stated that, even if McDowell had been placed on probation in October 2000, the fact that he had previously been placed on probation, as opposed to the date of his probation, is all that mattered. This statement makes little sense in light of Zaring's August 7, 2002 email, recommending that McDowell should lose his driving privileges due, at least in part, to the fact that he received a moving violation while on probation.

Second, the statement of position asserts that the "Company

limit" for points was "ten," suggesting that drivers could not
exceed this limit. T-Mobile, however, applies the 10-Point
System in a discretionary manner.[26] <u>See</u> Zaring Tr. 20:25-21:8
(stating that the 10-Point System is used "to evaluate a driving
history, to determine whether or not a driver is eligible to
drive for us or whether or not the driver needs some remedial
sort of attention"), 60:9-12 (stating that when he became aware
that a driver had ten or more points, the driver would be placed
on probation); Pl.'s Ex. 6 (October 11, 2000 email from Zaring to
Cormier discussing McDowell being placed on probation, explaining
that McDowell had ten points under the 10-Point System and noting
that it was Zaring's "understanding that under [that] policy, the
disposition of the driver is at management discretion"). It

---

[26] Zaring acknowledged that using the 10-Point System to
determine when a driver should be put on probation was not a
written policy. <u>Id.</u> 60:13-15. Zaring could not "remember
specifically" any drivers, other than McDowell, who had been
placed on probation for violating the 10-Point System.
<u>Id.</u> 64:21-23. Zaring also could not recall any employees having
their driving privileges revoked for violating the 10-Point
System. <u>Id.</u> 64:10-22. While plaintiff seeks to make much of
this testimony and the "discretion" available under the 10-Point
System, nevertheless, plaintiff's violation of the 10-Point
System was not the sole basis for revoking plaintiff's driving
privileges; plaintiff's violation of probation and failure to
report his August 1, 2002 accident were also considerations.
Even if plaintiff were able to undermine defendant's reliance on
the 10-Point System, that fact alone is not necessarily
sufficient to raise an inference of discrimination where there is
no reason to question the other two reasons offered by defendant
for revoking plaintiff's driving privileges.

42

should also be noted that although Zaring wrote on McDowell's MVR that McDowell had accumulated thirteen points and emphasized this total with an exclamation point, Zaring's August 7, 2002 email does not mention the 10-Point System. As Zaring admitted, he was focused at that time on plaintiff's violation of probation, not on any violation of the 10-Point System.

Third, the first addendum states that T-Mobile was unaware of Wyman's license suspension. However, as discussed supra, both Krum and another T-Mobile supervisor were aware of this suspension in 2001. Fourth, the first addendum implied, incorrectly, that McDowell had twenty-three points under the 10-Point System. Fifth, the second addendum stated that plaintiff's MVR was "run only after he engaged in the fourth (4) preventable accident in a Company vehicle on August 1, 2002." Pl.'s Ex. 29 (emphasis in original). McDowell's MVR was run on May 30, 2002 and not in response to August 1, 2002 accident. That MVR was, however, reviewed after plaintiff's August 1, 2002 accident.

In addition, defendant has offered conflicting explanations of its policy for running MVRs. According to the statement of position, "MVR's are routinely run on employees whose position within the Company requires them to drive." Pl.'s Ex. 4. The second addendum stated that

The Company has no set schedule in place for

43

> reviewing MVR records (i.e. "regularly" as
> described by the Commission).  However, the Company
> does routinely run MVR's on drivers as a result of
> a preventable accident in a Company vehicle.
> Drivers on Company probation may have their MVR's
> reviewed every three months, six months or annually
> for the duration of the probationary period.  This
> is based on the sole discretion of the Company and
> perceived risk and liability.

Pl.'s Ex. 29.  At his deposition, Zaring explained that Wilmouth

would request MVRs "when a driver was involved in a preventable

accident . . . or if the driver was on probation, she would

request periodic MVRs during the driver's probation period."  Not

only are these explanations somewhat contradictory, but none of

them can explain why McDowell's MVR was run in May 2002, at a

time when he was not on probation and had not recently been

involved in a preventable accident.

Inconsistencies in an employer's justifications for taking an

action, particularly where different reasons were offered at

different times (and before different tribunals), can raise a

issue of fact with the regard to the veracity of the proffered

reasons.  See Carlton v. Mystic Transp., Inc., 202 F.3d 129, 137

(2d Cir. 2000) (finding issue of fact where employer "expressly

stated" to the EEOC that job performance was not a factor in

plaintiff's termination and then later asserted plaintiff was

"terminated in part because of poor performance."); E.E.O.C. v.

Ethan Allen, Inc., 44 F.3d 116, 120 (2d Cir. 1994) (vacating

grant of Rule 50 motion where defendant later abandoned the
initial justification given to state investigators, which
defendant had earlier termed the "sole reason" for plaintiff's
discharge); Schmitz v. St. Regis Paper Co., 811 F.2d 131, 132-33
(2d Cir. 1987) (upholding trial court's finding of sex
discrimination where employer incorrectly told New York State
Division of Human Rights that plaintiff was terminated based on
seniority and later advanced a different rationale at trial).
But see Lyte v. S. Cent. Conn. Reg'l Water Auth., 482 F. Supp.2d
252, 265 (D. Conn. 2007) (distinguishing Carlton and finding that
defendant did not offer "inconsistent and varying explanation"
for plaintiff's termination because although defendants' EEOC
position statement maintained that the only reason for
termination was plaintiff's failure to return to work following a
leave of absence and defendant asserted, in contesting
unemployment claim, that plaintiff was terminated for poor
performance, plaintiff had, in fact, received numerous warnings
about his performance); Sharon Counsel v. Tri-Star Constr. Co.,
No. 01-cv-11788, 2004 WL 253298, at 3 n.4 (S.D.N.Y. 2004)
(finding no inference of discrimination where defendant admitted
that reason offered in statement to EEOC, which "was prepared by
counsel and not sworn to or verified by any employee of
[defendant]," was untrue, but defendants' reasons, including the

justification given to plaintiff at the time of her firing, remained unchanged).

To the extent that a defendant's communications with the EEOC statement contain factual errors, courts have, not surprisingly, taken a case-by-case approach in determining the impact of these errors. Compare Sarmiento v. Queens College CUNY, 386 F. Supp. 2d 93, 105 (E.D.N.Y. 2005) (finding single inaccurate statement in letter to EEOC insufficient to establish pretext where letter "address[ed] complicated factual and legal issues underlying four separate hiring decisions"), aff'd, No. No. 05-1236153, 153 Fed. Appx. 21 (2d Cir. Oct. 28, 2005) with Lent v. Goldman Sachs & Co., No. 97-cv-9413, 1998 WL 915906, at *6 (S.D.N.Y. Dec. 30, 1998) (rejecting defendant's argument that numerous "minor inconsistencies" in EEOC statement were irrelevant where discovery "ha[d] whittled away a good portion of defendant's contemporaneous support for its proffered non-discriminatory reason").

The instant case is distinguishable from Carlton, 202 F.3d 129, and Ethan Allen, 44 F.3d 116, as T-Mobile did not completely backtrack in litigation from its original rationale for revoking plaintiff's driving privileges and presented a generally consistent explanation for its actions. The various rationales offered by defendant are somewhat complementary as they all

46

involve violations of T-Mobile's driving rules.  See <u>Warren v. N.</u>
<u>Shore Univ. Hosp. at Forest Hills</u>, No. 03-cv-0019, 2006 WL
2844259, at *10 (E.D.N.Y. Sept. 29, 2006) (granting summary
judgment where defendant's multiple reasons for not hiring
plaintiff were "not conflicting, but complementary"); <u>Wisdom v.</u>
<u>M.A. Hanna Co.</u>, 978 F. Supp. 1471, 1480-81 (N.D. Ga. 1997)
(finding defendant's proffered reasons were not undermined where
supervisor's EEOC affidavit stated that plaintiff's lack of
certain skills and not performance issues was the reasons for
termination, but affidavit recounted performance issues, a
different supervisor relied on that reason and both of the two
reasons, which were "not mutually exclusive" were sufficient to
justify termination), <u>aff'd</u>, 141 F.3d 1190 (11th Cir. 1998)
(table case).  Although defendant's statements to the EEOC do not
align perfectly with defendant's proffered reasons or with all of
the evidence in the record, these discrepancies and defendant's
conflicting explanations about its MVR policy are, in light of
the other evidence in this case (particularly the fact that
Zaring was unaware of plaintiff's race), insufficient to show
pretext.

### iii.  **Plaintiff is unable to show discriminatory intent**

As explained above, plaintiff has failed to offer evidence
from which a jury could find that defendants' reasons for

revoking plaintiff's driving privileges were pretextual.  None of
the comparators proposed by plaintiff give rise to an inference
of discrimination.  The inconsistences in defendant's
explanations of its MVR policy and its statements to the EEOC are
insufficient, standing alone, to show that defendant's proffered
reasons for revoking McDowell's driving privileges were false.
Moreover, even if these inconsistences did raise a question of
fact as to the veracity of defendant's proffered reasons, a
reasonable jury could not infer from plaintiff's evidence that
defendant discriminated against McDowell.

"A plaintiff's prima facie case, combined with evidence that
the employer's asserted justification is false, may permit the
trier of fact to conclude that the employer unlawfully
discriminated."  <u>Reeves v. Sanderson Plumbing Prods. Inc.</u>, 530
U.S. 133, 141 (2000).  In <u>Reeves</u>, however, the Court made clear
that such a showing will not always be sufficient, and that the
determination must be made on a case-by-case basis, noting that
following relevant factors: (1) the strength of plaintiff's prima
facie case; (2) the probative value of the proof that the
employer's explanation is false; and (3) any other evidence that
supports the employer's case and that may properly considered
given the procedural posture of the case.  <u>Id.</u> at 149.
Plaintiff's prima facie case is weak and the inconsistencies that

plaintiff uses to undermine defendant's proffered reasons are not particularly probative of discriminatory intent. It is not disputed that plaintiff failed to report the August 1, 2002 accident, that he received an unreported citation while on probation and that he had more than ten points under the 10-Point System. Additionally, as discussed previously, Zaring, the critical decision-maker regarding the revocation of plaintiff's driving privileges, was not aware of plaintiff's race.

In Woodman v. WWOR-TV, Inc., 411 F.3d 69, 82-83 (2d Cir. 2005), the Second Circuit held that, in establishing a prima facie of age discrimination, plaintiffs who rely "on a substantial age discrepancy between [themselves] and [their] replacement[s]" in order to raise an inference of discrimination, "must adduce some evidence indicating defendant's knowledge as to that discrepancy." District courts in this circuit have applied Woodman to discrimination claims beyond the ADEA. Penney v. AIG Domestic Claims, Inc., No. 04-cv-9071, 2007 WL 541711, at *6-7 (S.D.N.Y. Feb. 20, 2007), (holding that plaintiff, who alleged race-based pay discrimination based on his starting salary, could not establish prima facie case because the individual who hired the plaintiff was not aware of the plaintiff's race when he initially offered the plaintiff his starting salary); Stainkamp v. Changes Int'l of Fort Walton Beach, Inc., 373 F. Supp. 2d 163,

167-68 (E.D.N.Y. 2005) (holding that plaintiff failed to establish prima facie case where there was no evidence that "the person who decided to terminate her . . . knew of her pregnancy on or before [the date of termination"); <u>Martinez v. Amalgamated Transit Union</u>, No. 03-cv-6291, 2005 WL 1485246, at *4 (E.D.N.Y. 2005) (holding that plaintiff was unable to establish prima facie case where plaintiff's supervisors "professed ignorance" of plaintiff's Native American heritage and Christian Apostolic religious background and plaintiff offered no evidence contradicting supervisor's statements).

Plaintiff's offers no evidence suggesting that Zaring was aware of plaintiff's race.  That Zaring was ignorant of this fact is not surprising given that Zaring was located in Washington State and appears to have had no opportunity to interact with McDowell face-to-face.  At his deposition, Zaring speculated that it was "possible" that he may have heard McDowell's voice on a voicemail message, but Zaring did not recall ever speaking to McDowell by telephone or hearing his voice.  <u>Id.</u> 39:2-18, 72:6-8. Although Zaring could have been made aware of plaintiff's race through his interactions with either Krum or Ellis, there is no evidence suggesting such information was ever relayed to Zaring. Notably, plaintiff's counsel never even asked Krum or Ellis

whether they discussed or disclosed plaintiff's race to Zaring.[27]

Plaintiff responds to Zaring's testimony by arguing that under Reeves, "the jury is entitled to disbelieve testimony of an interested witness."  In Reeves, the Court stated that a reviewing court "should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'" 120 U.S. at 151 (quoting 9A C. Wright & A. Miller, Federal Practice and Procedure § 2529, pp. 300 (2d ed. 1995)). Plaintiff, however, ignores the fact that he bears the burden of proof and that, even if Zaring's testimony was not considered, plaintiff has failed to come forward with any evidence from which a jury could infer that Zaring was aware of plaintiff's race.  In addition, it should be noted that one court of appeals has

_____

[27] The only evidence even remotely suggesting that Zaring may have been aware of McDowell's race is Zaring's October 11, 2000 email to Cormier, which recommended placing McDowell on probation.  Def.'s Ex. X.  In that email, Zaring noted that although he had discretion in dealing with McDowell's violation of the 10-Point System, he wanted to ensure that "any action would be consistent with past and future actions in similar circumstances."  Plaintiff does not raise this point and did not explore this issue at Zaring's deposition.  Absent evidence suggesting that fairness concerns were only raised (and such language only used) when employees in protected classes were disciplined, it cannot be inferred from the language of Zaring's email that Zaring was aware of plaintiff's race.

rejected plaintiff's interpretation of <u>Reeves</u>, holding that district courts may consider affidavits of interested defense witnesses where the testimony of that witness is uncontradicted. <u>Stratienko v. Cordis Corp.</u>, 429 F.3d 592, 597-98 (6th Cir. 2005). The court in <u>Stratienko</u> reasoned that a contrary interpretation of <u>Reeves</u> would "lead to absurd consequences because defendants will often be able to respond only thought the testimony of their employees." <u>Id.</u> at 598 (citation omitted).

In addition to plaintiff's failure to establish Zaring's knowledge of plaintiff's race, defendant also notes two other facts that undermine plaintiff's claim. First, at his deposition, plaintiff stated that he did not believe that Krum treated him differently because of his race. Pl. Tr. 107:18-21 (answering "no" when asked if he "believed Krum treated [him] differently because of [his] race" and stating that "I think he was a fair supervisor or manager"). Second, Ellis (along with Krum) recommended plaintiff for a promotion two months prior to plaintiff's termination.

For the reasons explained above, summary judgment must be granted on plaintiff's discriminatory discharge claim.

**(4)**

**Retaliation**

To make out a prima facie case of retaliation, plaintiff must show that (1) he engaged in a protected activity; (2) the defendant was aware of the protected activity; (3) the defendant took an adverse employment action against the plaintiff; and (4) there was a causal connection between the adverse employment action and the protected activity. Cruz, 202 F.3d at 565. Defendant disputes that plaintiff ever engaged in protected activity.

Plaintiff maintains that he complained to defendant that he had not been promoted. Plaintiff claims that he also complained about defendant's failure to promote Browne and Duval. At his deposition, plaintiff conceded that he never directly used the word "race" in making his complaints. In fact, the only specific incident plaintiff recalled was a complaint to Cormier that about why plaintiff's paperwork was taking longer than other technicians. Nothing in this complaint references Browne or Duval and, at his deposition, McDowell did not recall making any other complaints. Krum recalled plaintiff complaining about not being promoting and even remembered plaintiff mentioning that Duval had not been promoted. However, no specifics are available about these complaints.

Plaintiff contends he "implicitly" complained about discrimination by mentioning defendant's failure to promote

Browne, the other black technician, and Duval, a non-white Hispanic, in his complaints. According to plaintiff, this constitutes "implicit" discrimination, in light of the fact that "each and every white field technician was promoted, while the only two black field technicians were not promoted." Pl.'s Br. at 20.

Under certain circumstances, implicit complaints may constitute protected activity under Title VII. See Barber v. CSX Distrib. Servs., 68 F.3d 694, 702 (3d Cir. 1995) (finding that plaintiff's general complaint about unfair treatment did not "explicitly or implicitly allege that age was the reason for the alleged unfairness") (emphasis added). However, such circumstances are absent here. First, with the exception of McDowell's affidavit (which is contradicted by his deposition testimony), there is no evidence that McDowell ever mentioned the fact that Browne was not promoted. See Brown v. Henderson, 257 F.3d 246, 252 (2d Cir. 2001) ("factual allegations that might otherwise defeat a motion for summary judgment will not be permitted to do so when they are made for the first time in the plaintiff's affidavit opposing summary judgment and that affidavit contradicts [plaintiff's] own prior deposition testimony.") Absent this critical fact, plaintiff's "implicit" complaint theory crumbles. Second, even if plaintiff did mention

Browne, there is insufficient evidence about the particulars and context of his complaints to consider them to be implicitly about race discrimination. The only specific incident mentioned by plaintiff was a complaint about why his paperwork was taking longer than other field technicians; that complaint does not reference either Browne or Duval. Moreover, Krum's testimony does not reveal the specifics of any of McDowell's complaints. Third, as discussed previously in the context of plaintiff's failure to promote claim, there is no evidence that "each and every white field technician" was promoted. Absent such a scenario, it cannot be inferred that plaintiff's complaints were implicitly about discrimination.

## Conclusion

For the reasons stated above, defendant's motion for summary judgment is granted. The Clerk of the Court is directed to close the case.

Dated: Brooklyn, New York
      September 26, 2007

SO ORDERED:

_____/s/_____
David G. Trager
United States District Judge